IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CHINYERE OGBONNA-MCGRUDER, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:21-cv-00506 |
| | ) | JUDGE RICHARDSON |
| v. | ) | |
| | ) | |
| AUSTIN PEAY STATE UNIVERSITY et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Pending before the Court is "Defendant Austin Peay's Motion to Dismiss" (Doc. No. 56, "Motion"), filed by Defendant Austin Peay State University ("APSU" or "Defendant"). Via the Motion, APSU requests pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure the dismissal of all claims asserted against it in Plaintiff's First Amended Complaint (Doc. No. 53), the currently operative complaint in this case. APSU filed a brief in support of the Motion (Doc. No. 56-1, "Brief in Support"), and Plaintiff filed a brief in opposition to the motion (Doc. No. 59, "Opposition"), whereafter APSU filed a reply in support of the Motion (Doc. No. 61, "Reply").

<u>FACTUAL ALLEGATIONS</u>

In its Brief in Support, APSU provides a summary of the factual allegations from the First Amended Complaint that are relevant to this instant action as a whole.[1] Comparing that summary to the First Amended Complaint, the Court is satisfied (and Plaintiff does not seem to dispute) that the summary is accurate in both in its overall tenor and in its individual components. Thus, the Court adopts and sets forth that summary below, although the Court has taken the liberty to tweak the summary in particular ways as noted in the accompanying footnote,[2] primarily to clarify what allegations the Court is (and what the Court is not) accepting as true for purposes of the instant 12(b)(6) motion to dismiss.

> Plaintiff has been employed by APSU since 2003. (Doc. No. 53, ¶ 29.) Plaintiff was hired as a college professor, to teach classes in criminal justice and public management. (Id.) In Spring 2017, APSU faculty were advised by former Dean Denton that the-then Public Management/Criminal Justice Department would be split into two departments. (Id. at ¶ 31.) According to Plaintiff, faculty could request joint appointment, based on chair approval, with the two newly created departments – Criminal Justice and Public Management/Political Science. (Id. at ¶ 32.) Faculty from the original Public Management/Criminal Justice Department were told that they could self-select which department they wanted to join. (Id. at ¶ 33.) The self-selection did not include a review of faculty qualifications. (Id.) Dean Denton rejected Plaintiff's request and chair approval for joint appointment and denied her the opportunity to self-select her department. (Id. at ¶ 34.) Dean Denton

---

[1] That is not to say that everything set forth in such summary is necessarily indispensable or even relevant to the resolution of the instant Motion, but the summary nevertheless is worth setting forth nearly in its entirety.

[2] In this summary, where (alleged) facts are recounted without qualification, they are accepted as true for purposes of the instant motion. Conversely, where the (alleged) facts are qualified in some way (as for example by "Plaintiff claims"), they are not accepted as true for purposes of the present Motion.

In some places, the Court includes ellipses to omit the Brief in Support's language that qualifies the allegations of the First Amended Complaint to suggest that such allegations are not necessarily true, but rather merely alleged by Plaintiff (in the First Amended Complaint). Where the Court does so, its purpose is to make clear that it is unqualifiedly accepting the allegations as true for present purposes. In other places, the Court leaves in the qualifying language used in the Brief in Support, or adds a qualifying term in brackets, believing such qualification appropriate because, under *Iqbal* and *Twombly*, the corresponding allegations are treated not as true but instead as merely alleged by Plaintiff.

In this summary, notably, where the brackets and the language therein are set forth in bold face, they were added by the Court to APSU's summary. Otherwise, the brackets and the language therein are original to APSU's summary.

made the selection for Plaintiff. (Id. at ¶ 36.) Plaintiff claims that, as an African American, she was denied the opportunity to self-select her department. (Id. at ¶ 35.)

Plaintiff filed a formal complaint with APSU's Office of Equal Opportunity and Affirmative Action in 2017, alleging that Dean Denton engaged in race discrimination. (Id. at ¶¶ 37, 40.) APSU responded to the complaint in Summer 2019. (Id. at ¶ 37.) Plaintiff claims that the individual actions of Brown from Summer 2019 through the present, and the individual actions of Lyle-Gonga from 2020, "began to perpetuate a hostile work environment resulting in retaliatory treatment of Plaintiff." (Id. at ¶ 43.) Brown was Dean of the College of Behavioral and Health Sciences at APSU from 2019 through December 2021. (Id. at ¶ 4.) Lyle-Gonga, beginning January 1, 2020, was at all times relevant to the Complaint, Chair of the Department of Political Science and Public Management. (Id. at ¶ 5.)

In September 2019, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") (See EEOC Charge No.: 494-2019-02950, Doc. No. 53-1) (Id. at ¶ 41.) Plaintiff's September 2019 EEOC Charge was closed to allow the parties to negotiate but reopened after the parties failed to reach an agreement. (Id. at ¶ 42.) On September 29, 2020, Plaintiff filed another charge of discrimination with the EEOC, which was assigned the same EEOC Charge number as the September 2019 Charge. (Id. at ¶ 9.) Plaintiff claimed that she was discriminated against based on her race and sex in violation of Title VII of the Civil Rights Act of 1964. (See EEOC Charge No.: 494-2019-02950, Doc. No. 53-1.) Plaintiff filed a second charge of discrimination with the EEOC on or about June 17, 2021, alleging retaliation. (See EEOC Charge No.: 494-2021-01993, Doc. No. 53-2.)

As can be gleaned from the Complaint, Plaintiff's claims of race discrimination and the subsequent alleged retaliation and hostile work environment she suffered arise from the 2017 split in departments. (See generally, Doc. No. 53, ¶¶ 19, 31, 35-44.) Specifically, Plaintiff alleges:

> Defendants' discriminatory practices include, but are not limited to: (1) creating or permitting a hostile work environment heavily charged with discrimination; (2) maintaining wages, job assignments and other conditions of employment that unlawfully operate to deny equal opportunity to Plaintiff because of her race; (3) creating a hostile, racially charged work environment such that no reasonable person would be expected to endure, and (4) retaliating against Plaintiff for opposing discriminatory conduct.

(Id. at ¶ 28.) As to Plaintiff's race discrimination claims, she states **[that she,]** "as a tenured African American was denied the opportunity to self-select her department of out the two newly created departments[.]" (Id. at ¶ 35.) She also claims that "in Spring 2020, [she] was scheduled to teach a particular class in the

[F]all 2020 but a white adjunct professor replaced her." (Id. at ¶ 71.) The Complaint further states that in October 2019, "Brown yelled at plaintiff in front of a white faculty member" (Id. at ¶ 89) and "[s]aid harassment and inappropriate verbal scolding in the presence of a white faculty member was offensive and caused Plaintiff great shame and embarrassment[.]" (Id. at ¶ 90.)

With respect to Plaintiff's hostile work environment allegations, she generally claims that APSU "failed to exercise reasonable care to prevent and correct promptly any harassing, and/or offending behavior. The frequency of the discriminatory conduct, its severity, and pervasiveness are threatening and humiliating to Plaintiff and unreasonably interfered with Plaintiff's work performance. These actions adversely affected her emotional and/or psychological well-being. Such facts constitute a 'hostile and/or abusive' work environment." (Id. at ¶¶ 111-12.) Plaintiff further claims that since she is "an experienced and tenured African American professor, Defendants must find 'cause' to terminate her employment." (Id. at ¶ 24.) And in the absence of allegedly being able to find "cause", **[allegedly]** "Defendants have intentionally created a hostile work environment in hopes it would cause her to resign[.]" (Id. at ¶¶ 25, 27, 62, 66, 74, 77, 90, 93, 104.)

Specifically, the actions by Dean Brown and/or Department Chair Lyle-Gonga which allegedly perpetuated a hostile work environment include requesting that she move her office (Id. at ¶¶ 45-46), exclusion from a grant proposal (Id. at ¶¶ 47-53), refusing to confer with Plaintiff about the creation of a master's program (Id. at ¶¶ 58-60, 99), refusal to act on Plaintiff's appeal based on the lack of a faculty appraisal (Id. at ¶¶ 61-63), denigrating Plaintiff's teaching and research done with minority students (Id. at ¶¶ 64-68), failure to timely receive clarification about a replacement class she would be teaching (Id. at ¶¶ 71-77), denied the ability to teach summer classes (Id. at ¶ 88), harassment and verbal scolding in the presence of a white faculty member (Id. at ¶¶ 89-90), failure to recognize Plaintiff's accomplishments in the conduct of her annual evaluations, and evaluations and appeals generally (Id. at ¶¶ 55, 78-80, 91-95), not assigning courses Plaintiff selected to teach (Id. at ¶¶ 81-87, 96-98), and criticism of her speech accent and thereby her natural origin. (Id. at ¶ 109).

Lastly, Plaintiff claims that, since the filing of her complaint with APSU in 2017, she has experienced retaliation by Defendants. (Id. at ¶ 23.) Plaintiff then states that by and through the actions of the Department Chair and Dean, APSU has engaged in retaliatory treatment of Plaintiff from Summer of 2019 through the present. (Id. at ¶ 43.) Such **[alleged]** retaliatory conduct . . . includes the following:

• In September 2019, Plaintiff was instructed by Brown to move from her office to a basement office as a form of retaliation after reporting and opposing previous racially charged discriminatory conduct. This was the second attempt in 2019 to transfer her to a basement office. (Id. at ¶¶ 45-46) (emphasis added) (hereinafter "the request to change offices".)

• In October 2019, Plaintiff requested that she be included in a grant proposal for a new juvenile detention center in Tennessee. Plaintiff claims she was purposefully excluded from participation as evidenced in the final brochure. (Id. at ¶¶ 47-54) (hereinafter "the grant proposal".)

• In March 2020, Plaintiff did not receive an annual evaluation per university policy for her performance in the 2019-2020 academic year under the pretext of Plaintiff not submitting all of the necessary documents. (Id. at ¶¶ 55-57) (hereinafter "the 2019-2020 evaluation".)

• In January 2020, the professors within the political science and public management department voted unanimously for Plaintiff to move into phase two of the creation of the master's program. Plaintiff had previously submitted the initial phase one request on "curriculog" and it was approved. Brown and Department Chair [Lyle-] Gonga have deliberately refused to confer with Plaintiff about this matter. (Id. at ¶¶ 58-60) (hereinafter "the master's program".)

• In February 2022, Plaintiff was not assigned the courses that she requested to teach. Plaintiff was advised that she was not qualified to teach classes she had previously taught for some 18 years. (Id. at ¶¶ 96-98) (hereinafter "course choices".)

(Doc. No. 57-1 at 2-6) (footnotes omitted).

Based on these allegations, the First Amended Complaint (without clearly breaking out Plaintiff's claims into separate counts) asserted that APSU has violated particular provisions of Title VII of the Civil Rights Act of 1964 as amended. (Doc. No. 53 at ¶ 26). In particular, it asserted a claim of discrimination on the basis of race in violation of Section 703(a) of Title VII (codified at 42 U.S.C. § 2000e-2(a)); for whatever reason, it specifically invoked Section 703(a)(2) of Title VII, rather than the more familiar Section 703(a)(1).[3] (Id.). And she also brings a claim of

---

[3] Each of these two paragraphs of Section 703(a) outlaws discrimination based on a protected classification (such as racial discrimination), but they facially outlaw different kinds of discriminatory treatment. Specifically, Section 703(a)(1) declares it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). By contrast, Section 703(a)(2) declares it an unlawful employment practice for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of

retaliation in violation of Section 704(a) of Title VII (which is codified at 42 U.S.C. § 2000e-3(a)).[4]

The Court gleans (largely though not exclusively from paragraph 28 of the First Amended Complaint), as apparently did Defendant, that the First Amended Complaint brought the following claims, all under Title VII: (1) hostile work environment based on race; (2) discrimination against Plaintiff in the terms and conditions of her employment (what the Court herein will call "general discrimination," to distinguish it both from general retaliation and from and race-based or retaliatory hostile work environment) based on her race; (3) retaliation against Plaintiff in the terms and conditions of her employment (what the Court herein will call "general retaliation," to distinguish it both from general discrimination and from and race-based or retaliatory hostile work environment) for opposing alleged race-based discrimination; and (4) retaliatory hostile work environment.

---

employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). It strikes the Court that it is the former, rather than the latter, paragraph of Section 703 that better fits the fact pattern set forth in the First Amended Complaint, but the Court, construing the First Amended Complaint in favor of Plaintiff as required, finds that it sufficiently invokes the applicable paragraph (whatever it is) to put APSU and the Court on notice that she is asserting a claim of race discrimination under Title VII and thus will not fail by virtue of (arguably) invoking the wrong paragraph of Section 703(a) in so doing.

[4] That subsection provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

<u>LEGAL STANDARDS</u>

The instant Motion is brought under Rule 12(b)(6), and this is appropriate because the motion asserts that Plaintiff has failed to state a claim against the Individual Defendants upon which relief can be granted. The Court thus will state below the legal principles generally applicable to a Rule 12(b)(6), before noting (in the following section hereof) that many of these principles are not implicated with respect to the *first* of the below-stated two issues the Court must decide.

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). To put it only slightly differently, "[a] Rule 12(b)(6) movant 'has the burden to show that the plaintiff failed to state a claim for relief.'" *Willman v. Att'y Gen. of United States*, 972 F.3d 819, 822 (6th Cir. 2020) (quoting *Coley v. Lucas Cnty*., 799 F.3d 530, 537 (6th Cir. 2015)). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

Importantly, as Plaintiff correctly notes and Defendant does not dispute, the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973),

holding modified by *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), is inapplicable on a Rule 12(b)(6) motion to dismiss.[5] That means that a plaintiff need not allege facts specifically indicating that the plaintiff could carry the burden she might ultimately bear under *McDonnell Douglas*. This is because *McDonnell Douglas* "is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002). And that is because a plaintiff is not required to plead what would qualify as a prima facie case for purposes of *McDonnell Douglas*. *See, e.g.*, *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012) ("The district court's requirement that [the plaintiff's] complaint establish a prima facie case under *McDonnell Douglas* and its progeny is contrary to Supreme Court and Sixth Circuit precedent."); *Clough v. State Farm Mut. Auto. Ins. Co.*, No. 13-2885-STA-tmp, 2014 WL 1330309, at *6 (W.D. Tenn. Mar. 28, 2014) ("In light of *Swierkiewicz*, the Court concludes that strictly speaking Plaintiff need not plead all of the elements of the prima facie case in order to survive a motion to dismiss."). The undersigned

---

[5] The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* framework as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a prima facie case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

explained this in some detail in resolving a motion to dismiss a plaintiff's claims brought under

the Tennessee Human Rights Act ("THRA"):[6]

> But since this is a Motion to Dismiss, and not a motion for summary judgment, Plaintiff is not required to carry a burden of presenting evidence establishing a prima facie case under *McDonnell Douglas*. *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012). *McDonnell Douglas* "is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510-11 (2002). "[T]he precise requirements of a prima facie case can vary depending on the context and before discovery has unearthed the relevant facts and evidence, it may be difficult to define the appropriate formulation. Significantly, the Supreme Court identified the possibility that discovery may produce direct evidence of discrimination, rendering the *McDonnell Douglas* burden-shifting framework inapplicable to a plaintiff's claims." *Keys*, 684 F.3d at 609 (discussing *Swierkiewicz*) (internal citation omitted).
>
> This only stands to reason. After all, the *McDonnell Douglas* framework contemplates that a defendant can, if necessary, attempt to prevail by setting forth its position on a factual issue (*i.e.*, as to the existence of a legitimate, non-discriminatory reason for its challenged employment actions). 411 U.S. at 802. But except perhaps in a very limited sense (as for example when a district court will consider, if uncontradicted in a plaintiff's reply brief, a defendant's factual assertions as to the content in a document referred to in the plaintiff's complaint) a defendant's position regarding the facts simply is not [to] be considered on a Rule 12(b)(6) motion to dismiss. *See Burns v. United States*, 542 F. App'x 461, 466-67 (6th Cir. 2013). Therefore, the *McDonnell Douglas* framework does not apply on this Motion, and Plaintiff is not required here to make out a prima facie case as required by *McDonnell Douglas* on a motion for summary judgment; instead Plaintiff must satisfy the plausibility requirement for a motion to dismiss.

*Jodry v. Fire Door Sols., LLC*, No. 3:20-cv-00243, 2020 WL 7769924, at *3–4 (M.D. Tenn. Dec.

30, 2020) (Richardson, J.). So as noted in *Keys*, *McDonnell Douglas* ultimately may not apply at

all in a particular case; specifically, it would not apply if the plaintiff can rely on direct evidence

of discrimination, rather than indirect evidence of discrimination (which is what *McDonnell*

*Douglas* deals with). And even if *McDonnell Douglas* would apply at later stages of the case, it

---

[6] THRA claims are generally analyzed under Title VII standards. *See Armstrong v. Tennessee Education Lottery Corp.*, 219 F. Supp. 3d 708, 714 at n.1 (M.D. Tenn. 2016). Therefore, the Court's discussion here is applicable to Title VII claims.

cannot sensibly be applied at the pleading stage, and so its requirement of a showing of a *prima facie* case must not be applied at the pleadings stage.

<u>DISCUSSION</u>

The Court will address in turn each of the three above-identified claims.

A. <u>The First Amended Complaint fails to set forth factual matter plausibly suggesting a race-based hostile work environment</u>.

Consistent with the discussion above regarding the inapplicability of *McDonnell Douglas* at the pleading stage, this Court has noted specifically with respect to claims of hostile work environment:

> Although a plaintiff must ultimately prove all of the[ ] elements [of an indirect-evidence prima facie case of hostile work environment] to prevail, she does not have the initial burden of establishing a prima facie hostile work environment claim to survive a motion to dismiss. *See Swierkiewicz*, 534 U.S. at 512, 122 S. Ct. 992. Instead, the Complaint need only allege "sufficient 'factual content' from which a court, informed by its 'judicial experience and common sense,' could 'draw the reasonable inference'" that the plaintiff was subject to a hostile work environment. *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937).

*Austin v. Alexander*, 439 F. Supp. 3d 1019, 1024 (M.D. Tenn. 2020).[7] But something additional must be noted here: the reasonable inference that must be drawn is that the plaintiff was subject

---

[7] It is worth noting that a plaintiff that does so will inevitably have gone a long way towards establishing an indirect-evidence prima facie case of hostile work environment, which the Sixth Circuit has described as follows:

> Like discriminatory actions, hostile-work-environment claims based on indirect evidence are analyzed under a version of the *McDonnell Douglas* framework. To make out a prima facie case, a plaintiff must show: "(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex or race; (4) the harassment created a hostile work environment; and (5) employer liability."

*Kubik v. Cent. Michigan Univ. Bd. of Trustees*, 717 F. App'x 577, 584 (6th Cir. 2017) (quoting *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 500 (6th Cir. 2009)). If a plaintiff alleges facts from which a protected class-based hostile work environment reasonably could be inferred, then she well may also have plausibly alleged at least the first four of these five elements.

not merely to a hostile work environment, but rather to a hostile work environment *based on a protected classification*—here, race. [8] *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 786–87, (1998). This follows easily from the fact that subjecting an employee to a hostile work environment is a form of the discrimination outlawed by Section 703(a)—*i.e.*, discrimination based on a protected classification. An employer is not liable under Section 703(a) for a hostile work environment that is not based on a protected classification, and so a complaint does not plausibly suggest liability under Section 703(a) based on a hostile work environment unless it plausibly

---

Significantly, in the case of hostile work environment, the indirect-evidence prima facie case has built into it (in the third element) the explicit notion of protected class-based discriminatory animus. (This reality, not to mention some other realities, arguably calls into question whether what the Sixth Circuit refers to as an indirect-evidence prima facie case actually is an "indirect evidence" case, given that it directly incorporates the notion of discriminatory animus based on a protected classification). By contrast, in the case of multiple other kinds of Title VII claims (*i.e.*, general discrimination and general retaliation, as the Court has defined those terms above), the elements of an indirect-evidence prima facie case entirely omit anything close to an explicit reference to discriminatory (or retaliatory) animus. *See, e.g.*, *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) (noting that to establish an indirect-evidence prima facie case of general discrimination in violation of Title VII, a plaintiff must show that she was "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees."). Notably, unlike the third element of the so-called indirect-evidence prima facie case of hostile work environment, the fourth element of an indirect-evidence prima facie case of general discrimination (which comes closer than the other three elements to setting forth an explicit requirement to show discriminatory animus) does not require a showing of discriminatory animus; instead, it requires a showing of not-necessarily nefarious circumstances that, together with the other three sets of circumstances, are treated as raising for summary judgment purposes an *inference* of discriminatory animus (an inference a jury would be free to reject if it were suggested by the plaintiff at trial if summary judgment were denied).

But the Court follows binding Sixth Circuit precedent in treating the above five elements not as elements required for *every claim* of hostile work environment, but rather as elements for an indirect-evidence case of hostile work environment in those cases in which the plaintiff does choose to pursue a claim of hostile work environment under *McDonnell Douglas* in order to avoid summary judgment. Having said that, the Court notes that consistent with its observations above, the kind of evidence that would satisfy the third element of an indirect-evidence case likely would often constitute direct evidence of hostile work environment based on animus towards a protected class.

[8] *Austin* omits any reference to a complaint needing to plausibly allege *employer liability for* a hostile work environment. Presumably, the complaint indeed must do so, because otherwise the complaint has not plausibly alleged the *defendant's liability*, as required by *Iqbal* and *Twombly*. But the Court herein will assume arguendo, to Plaintiff's benefit, that a complaint need not do so.

suggests that the hostile work environment was based on a protected classification (meaning, here, race).

To be actionable, the (protected class-based) harassment creating the hostile work environment must be extreme. *See, e.g., id.* Title VII is not a "general civility code," and so "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are insufficient to support a claim of hostile work environment (even if it is based on a protected classification). *Id.* (internal quotation marks omitted). Putting it somewhat differently, the Supreme Court has noted that to constitute a hostile work environment, the collective conduct must be "severe" or "pervasive," both objectively (*i.e.*, from the perspective of the hypothetical reasonable person) and subjectively (*i.e.*, from the perspective of the plaintiff herself). *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006). As the Sixth Circuit has noted:

> Therefore, a court should first determine what harassment was based on a plaintiff's race, and then ask whether that harassment in its totality was sufficiently severe or pervasive to create a jury question on this element. . . . . Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify." *Id.* (internal citation omitted).

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).[9]

---

[9] *Williams* made these observations in assessing whether the plaintiff could establish an indirect-evidence prima facie case, in reviewing the district court's resolution of the defendant's summary-judgment motion. But the Court has no doubt that these observations are equally applicable to a court assessing whether a plaintiff has made allegations plausibly suggesting a protected class-based hostile work environment, in reviewing a defendant's Rule 12(b)(6) motion to dismiss.

Under these standards, the First Amended Complaint plainly does not state a valid claim of hostile work environment based on Plaintiff's race. As Defendant correctly notes, Plaintiff has not alleged that APSU or its employees "'made any statements concerning her race, nor does she allege that [APSU] or its employees engaged in any conduct whatsoever that could reasonably be interpreted as racially motivated.'" (Doc. No. 56-1 at 13) (quoting *Veasy v. Teach for Am., Inc.*, 868 F. Supp. 2d 688, 696 (M.D. Tenn. 2012)). Beyond wholly conclusory assertions (which the Court must disregard in its analysis, as noted above) that the purported hostile work environment was race-based, Plaintiff makes no allegations that would support the notion that any alleged hostile work environment was hostile specifically due to Plaintiff's race. She makes no allegations that suggest harassing conduct that was racist or racial—whether overtly or covertly (by innuendo, suggestion, etc.).

Still less does Plaintiff assert conduct that is severe or pervasive in its harassing nature, even under an expansive view of what could be objectively viewed as abusive. In making this determination, the Court begins by identifying what kind of conduct can even count towards a finding of a hostile work environment.

A hostile work environment is created by conduct—namely, "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris*, 510 U.S. at 21). That is to say, it is the sufficient accumulation of this sort of conduct that eventually amounts to a hostile work environment. And it is this sort of conduct—to repeat, *discriminatory intimidation, ridicule, and insult*—[10] that

---

[10] Presumably this description is broad enough to encompass all manner of slurs, insults, offensive verbal or practical jokes, unwanted physical contact, and the like.

contributes to a finding of a hostile work environment. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 994 (6th Cir. 2009) ("[H]ostile-work-environment claims 'involve[ ] repeated conduct' and require the plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult [.]").

To put the matter somewhat differently, acts that contribute towards of a finding of a hostile work environment are acts of *harassment*. *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (noting that hostile work environment claims by "[t]heir very nature involve[] repeated conduct," and indicating that they require "repeated . . . harassment" and that "a single act of harassment may not be actionable on its own"). Hostile work environment claims are about *harassment;* this applies to hostile work environment claims based on race just as it applies to hostile work environment based on sexual harassment. *See id.* at 116 n. 10; *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66-67 (1986) (referring repeatedly to a hostile work environment, including but not limited to ones involving sexual harassment, in terms of an environment of "harassment")

And, as noted above, this means harassment in the sense of intimidation, ridicule, and insult (and the like). Many kinds of actions suffered by employees simply do not fit this description. In particular, actual *employment-related* actions taken by an employer against an employee (negative though they may be for an employee) do not fit that description. *Cf., Haley v. Clarksville-Montgomery Cnty. Sch. Sys*., 353 F. Supp. 3d 724, 735 (M.D. Tenn. 2018) (drawing a distinction between (a) actions that would support a claim of hostile work environment subject to the below-discussed plaintiff-friendly limitations analysis of *Morgan*, and (b) "'discrete acts' related to [the plaintiff's] employment."). This is because employment-related actions (whether or not they are illegally discriminatory or otherwise wrongful) are not in the nature of

harassment in the form of intimidation, ridicule, or insult. Such an action itself (as distinguished from any surrounding circumstances indicating that such action was motivated by discriminatory animus and thus constituted illegal discrimination) is not part a hostile work environment. Employment-related actions such as a suspension, termination, denial of transfer, or refusal to hire, each is a discrete act, which "cannot properly be characterized as part of a continuing hostile work environment." *Sasse v. U.S. Dep't of Lab.*, 409 F.3d 773, 783 (6th Cir. 2005); *see also Taylor v. Donahoe*, 452 F. App'x 614, 620 (6th Cir. 2011) ("First, the alleged wrongs identified by plaintiff represent discrete acts of alleged retaliation (or discrimination) rather than acts contributing to a hostile work environment.").[11]   In short, "[w]here[as] the prohibition of discrete discriminatory acts guards against illegally motivated adverse employment action, a hostile work environment claim 'offers employees protection from a "workplace[ ] permeated with discriminatory

---

[11] By the same token, a single act (a slur, attempt at intimidation, etc.) that contributes to a hostile work environment generally would never itself be an "adverse employment action" for purposes of a Title VII general discrimination claim, which is defined as an action by the employer that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (quoting *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998)).  This is because "offhand comments and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Sessin v. Thistledown Racetrack, LLC*, 187 F. Supp. 3d 869, 877 (N.D. Ohio 2016) (citing *Hafford v. Seidner*, 183 F.3d 506, 512-13 (6th Cir. 1999)). As discussed further herein, in the Title VII retaliation context, "adverse employment action is defined more broadly as something that "'a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (quoting *Garner v. Cuyahoga Cnty. Juvenile Court,* 554 F.3d 624, 639 (6th Cir. 2009)).  A single act of harassment comprising part of a hostile work environment is more likely to constitute an adverse employment action for purposes of a general retaliation claim than for purposes of a general discrimination claim. Even so, such an act naturally would have to be fairly serious to dissuade a worker from asserting her rights under Title VII, and thus would not generally rise to the level of an adverse employment action even for purposes of a retaliation claim.

    As is relevant to the First Amended Complaint in particular, in the Court's view of what a reasonable jury could conclude about the reaction of a reasonable employee to a single instance of being yelled at, such an instance as a matter of law does not rise to the level of an adverse employment action for purposes of a general discrimination claim. Perhaps the results could be different of the circumstances surrounding the yelling were especially egregious, but the First Amended Complaint, in its barebones recounting of this incident, alleges no such circumstances.

intimidation, ridicule, and insult.""" *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 832 (E.D. Mich. 2009) (quoting *Barrett,* 556 F.3d at 514 (quoting *Harris*, 510 U.S. at 21)). Much of the case law distinguishing employment-related actions from acts contributing towards a hostile work environment happens to refer to employment-related actions that rise to the level of an "adverse employment action," *i.e.* something that constitutes a separate "unlawful employment practice" on its own." *E.g.*, *Morgan*, 536 U.S. at 114-115. But the undersigned sees no reason why the distinction does not apply equally to employment related-actions that do not rise to the level. For example, being placed on paid leave is not an "adverse employment action." *Townsend v. Rockwell Automation, Inc.*, 852 F. App'x 1011, 1016 (6th Cir. 2021). But it is nevertheless indisputably an employment-related action and is entirely distinguishable from the kind of acts—intimidation, ridicule, and insults—that contribute towards a hostile work environment. !

True, any employment-related action conceivably could be motivated by discriminatory intent (and thus violate Title VII), and such discriminatory intent may be proven in part by prior discriminatory intimidation, ridicule, and insult. But that does not mean that the employment-related action itself constitute acts of discriminatory intimidation, ridicule, and insult that could contribute towards a hostile work environment.

Of course, a plaintiff could always claim to have felt "harassed"—or, more specifically, "intimidated" or "insulted"—by an employment-related action that the plaintiff perceives as negative towards him or her. But that is simply not the kind of harassment, intimidation or ridicule that contributes towards a hostile work environment.

Viewed against these standards, most of the alleged conduct that supposedly created the hostile work environment for Plaintiff is not the kind of conduct that can even contribute towards a finding of a hostile work environment. As listed by Plaintiff, (Doc. No. 59 at 8-9), such conduct

consists primarily not of *harassment* (intimidation, ridicule, insult and the like) but rather of *employment-related actions*[12] negatively affecting her status as an employee.[13] So the Court, in assessing whether Plaintiff has plausibly alleged conduct amounting to a hostile work environment, disregards such employment-related actions.

As for the acts listed by Plaintiff that are (or arguably are) less employment-related actions and more in the nature of harassing conduct, the Court perceives only three at most. Two are arguably insults—"Gonga's assertion that Plaintiff was not qualified to teach classes she had previously taught for some 18 years" and "Brown's denigration of Plaintiff's work despite having never observed it." (Doc. No. 59 at ¶¶ 65, 86). The third is arguably intimidation: "Brown's public scolding of Plaintiff in the presence of a white employee." (*Id.* at ¶ 89). These incidents occurred, respectively, in spring 2021, on October 9, 2019 (Doc. No. 53 at ¶ 89, ¶¶64-65, ¶¶ 81-86).

In assessing a claim of hostile work environment, the Sixth Circuit has noted:

> The harassing conduct cannot be viewed in isolation, but [rather] "we must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) (citing *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)). "Specifically, we must consider 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.' " *Id.* (alterations in original) (quoting *Harris*, 510 U.S. at 23, 114 S. Ct. 367).

---

[12] Some of these employment-related actions are alleged failure[s], non-responses, and so forth on the part of Gonga or Brown. These may be thought of alternatively as employment-related *in*actions, but for purposes of the instant analysis they amount to employment-related actions.

[13] To the extent that such employment-related actions rise to the level of an adverse employment action, they each conceivably could be alleged separately as an unlawful employment practice in support of a claim of general discrimination. But as noted herein, Plaintiff has made clear in her Opposition that she is not at this time pursuing any claims of general discrimination.

*Strickland v. City of Detroit*, 995 F.3d 495, 506 (6th Cir. 2021)(decided in context of alleged race-based hostile work environment). A dozen years ago, a district court in this district made pertinent observations that are still apt:

> The more severe the incidents, the less pervasive and frequent they need to be to create a hostile work environment. *Rabidue v. Osceola Ref. Co.,* 805 F.2d 611, 620 (6th Cir.1986) "The harassment should be ongoing"; mere "isolated instances" are insufficient. *Clark v. United Parcel Serv., Inc.,* 400 F.3d 341, 351–52 (6th Cir.2005) (holding that three instances of harassment over a period of approximately two and a half years were insufficient to be severe or pervasive, but that seventeen instances during the same time period were sufficient to reverse the District Court's grant of summary judgment in favor of the defendant). Cases in the Sixth Circuit are not quick to find a racially discriminatory hostile work environment.

*Neal v. Shelby Cnty. Gov't Cmty. Servs. Agency*, 815 F. Supp. 2d 999, 1005 (W.D. Tenn. 2011)

With all of these principles in mind, the Court proceeds to address these factors with respect to the three incidents. Arguably, the instance of being yelled at and the instance of being told she was unqualified to teach certain classes, qualifies as humiliating; but the First Amended Complaint does not provide nearly enough factual matter to solidify the humiliating (or, for that matter, the otherwise "severe") nature of these incidents. None of the three qualifies as physically threatening. Collectively, the three incidents could have had some negative effect on Plaintiff that could tangentially interfere with Plaintiff's work performance, but on balance they simply would not have the effect of interfering substantially with Plaintiff's performance of her job duties as a professor. But ultimately what dooms Plaintiff's claim here is the lack of frequency; she has alleged a grand total of three acts of harassment within 18 months. This is not frequent.

The Court of course is aware that this case is only at the pleadings stage. But the applicable pleading (the First Amended Complaint) nevertheless must satisfy *Iqbal* and *Twombly*. Even collectively, the three alleged instances of harassment upon which Plaintiff relies fail to plausibly

suggest a hostile work environment based on race. That is, as discussed above it does not plausibly suggest abuse based on race. Nor does it plausibly suggest severity or pervasiveness of abuse.

Accordingly, the cause of race-based hostile work environment must be dismissed for failure to state a claim upon which relief may be granted.[14]

---

[14] For this reason, the Court need not here ultimately resolve Defendant's argument that all of Plaintiff's claims are either time-barred or subject to dismissal for failure to exhaust administrative remedies. But the argument is worth discussing nevertheless.

Title VII requires an employee to file a charge with the EEOC within either 180 days or 300 days of an allegedly unlawful employment practice, depending on the law of the applicable state and whether that state is a "deferral state." 42 U.S.C. §2000e-5(e)(1); *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 407 (6th Cir. 1999). "The United States Supreme Court has held that these time periods operate, essentially, as a form of [limitations period]." *Whitehead v. Grand Home Furnishings, Inc.*, No. 2:19-CV-00040-DCLC, 2020 WL 1237423, at *4 (E.D. Tenn. Mar. 13, 2020) (citing *Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 122 (2002)). Tennessee is a deferral state, and so the 300-day limitations period, instead of the 180-day limitations period, applies if a plaintiff who has filed with the EEOC filed first or contemporaneously with the Tennessee Human Rights Commission ("THRC"). *Equal Employment Opportunity Comm'n v. Dolgencorp, LLC*, 196 F. Supp. 3d 783, 799 (E.D. Tenn. 2016), *aff'd*, 899 F.3d 428 (6th Cir. 2018).

Any of the acts upon which Plaintiff relies to support a claim would be separately subject to the 300-day limitations period to the extent that it qualifies by itself as "an unlawful employment practice." Each "adverse employment action" taken with a discriminatory or (as here) retaliatory motive is a separate "unlawful employment practice" in this sense. *Nat'l R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 114 (2002), ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice. [Plaintiff] can only file a charge to cover discrete acts that occurred within the appropriate time period."); *Sasse*, 409 F.3d at 783 ("A suspension, like a termination, denial of transfer, or refusal to hire, constitutes a separate actionable 'unlawful employment practice.' "). Relatedly, each alleged "unlawful employment practice" must be administratively exhausted (within the applicable timeframe), meaning that it must be included within the scope of an EEOC charge filed within that timeframe. *See Williams v. Nw. Airlines, Inc.*, 53 F. App'x 350, 352 (6th Cir. 2002).

Defendant here essentially argues that to the extent that any of the various events allegedly is an adverse employment action (and thus an unlawful employment practice) in its own right, it is separately subject to the 300-day statute of limitations and the requirement of administrative exhaustion. Defendant then argues that these requirements were not satisfied with respect to any single act that constituted an adverse employment action.

In response, Plaintiff asserts that Defendant's argument here fails "because the time limit for bringing hostile work environment claims is different in kind from alleging discrete acts." (Doc. No. 59 at 6). As noted below, this assertion is correct. But in relying exclusively here on this assertion, Plaintiff forgoes any reliance on any discrete adverse employment actions. Plaintiff thus has abandoned any claim of adverse employment action other than a claim of hostile work environment. So Plaintiff's claims stand or fall as claims of hostile work environment.

As to claims of hostile work environment, Plaintiff essentially asserts she need not satisfy the 300-day deadline (or the requirement of exhaustion) with respect to every act that she wishes to assert was a contributor to the alleged hostile work environment. This is correct.

B. <u>The First Amended Complaint fails to set forth factual matter plausibly suggesting general discrimination based on race, and in any event Plaintiff has abandoned a claim of general discrimination based on race.</u>

The First Amended Complaint is similarly deficient with respect to its claims of race-based general discrimination. The Court has looked in vain for anything therein, beyond mere conclusory assertions, that would suggest that any changes in the terms or conditions of her employment—even assuming that at least one of them constituted an "adverse employment action" as is required to support a claim of general discrimination—[15]were race-based, *i.e.*, based on discriminatory animus towards her because she was African-American.

---

*Morgan* explicitly noted, "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct . . . Such claims are based on the cumulative effect of individual acts." *Morgan*, 536 U.S. at 115. The Court went on to say:

> A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice . . . It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.* at 117. Though *Morgan* stated this principle in deciding whether the applicable alleged incidents of hostile work environment in that case were individually subject to the statute of limitations, the same principle applies in deciding whether alleged specific incidents of hostile work environment are individually subject to the requirement of administrative exhaustion: As Morgan indicates, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice'" and so "it does not matter . . . that some of the component acts of the [alleged] hostile work environment" were not administratively exhausted, as long as the overarching claim of hostile work environment (the alleged "unlawful employment practice" at issue) was administratively exhausted. *Id.*

The Court herein will assume arguendo that at least one of the three acts properly deemed to contribute towards a hostile work environment was within the 300-day period and that the claim of hostile work environment (as whole) was properly administratively exhausted before the EEOC (irrespective of whether every act contributing to the hostile work environment was presented to the EOOC). Thus, the Court will not dismiss either of Plaintiff's claims (each a hostile work environment claim) for failing to exhaust administrative remedies within the applicable 300-day time limit.

[15] Defendant asserts that "Plaintiff has not asserted that her compensation, terms, conditions or privileges of employment were affected because of her race." (Doc. No. 56-1). This assertion is not frivolous, but it is unsupported by any real analysis, such as an examination of what effects are actually alleged in the First Amended Complaint and why none of them amounts to an "adverse employment action." Although the Court realizes that any such examination would be hindered by the First Amended Complaint's less-than

Obviously, the fact that someone is African-American and experiences an adverse employment action does not mean that she experienced the adverse employment action *because* she was African American. There needs to be something more. At the pleading stage, there does not necessarily need to be a whole lot, but there does need to be factual matter (as opposed to conclusory assertions) plausibly suggesting that discriminatory animus. And to the extent that the actual content of Plaintiff's two charges of discrimination filed with the EEOC (Doc. Nos. 53-1, 53-2) is considered to have been incorporated into the First Amended Complaint, they likewise fail to include any factual matter plausibly suggesting racial animus for anything that (allegedly) happened to Plaintiff. The closest the First Amended Complaint comes is when it alleges that Plaintiff was replaced, in teaching a particular class in Spring 2020, by a white adjunct professor. But merely being replaced in teaching a class is not an adverse employment action. *See Howard v. Bd. of Educ. of Memphis City Sch.*, 70 F. App'x 272, 280 (6th Cir. 2003) (finding teacher's transfer from her classroom at one school to another did not constitute an adverse employment action for purposes of a Title VII general discrimination claim); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) ("This court has held that reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."); *Hamido v. Tennessee State Univ.*, No. 3:16-CV-2733, 2018 WL

---

ideal specification of all of the alleged adverse employment actions, the First Amended Complaint does allege various negative events that have occurred during the course of Plaintiff's employment with Defendant, and it was incumbent on Defendant (as the movant) to do more than that to show the absence of allegations plausibly suggesting even a single event that amounts to an "adverse employment action" as that notion is elucidated by case law. Thus, the Court declines to find that Plaintiff failed to adequately allege even a single actionable adverse employment action. (The Court herein does conclude, however, with respect to the two events as to which the First Amended Complaint does set forth alleged factual matter related to race, that neither of those two incidents reflected an adverse employment action). Ultimately, though, the claim of general discrimination nevertheless is subject to dismissal for the reasons set forth herein.

1964413, at *3 (M.D. Tenn. Apr. 26, 2018) (finding that reassignment of classes away from teacher-plaintiff did not constitute adverse employment action for purposes of a Title VII general discrimination claim). Alternatively, the Court believes that Plaintiff's replacement in teaching a class by a white adjunct professor—while *consistent* with a racially discriminatory animus for the replacement—does not make discriminatory animus *plausible*.[16]

The First Amended Complaint's only other reference to factual matter concerning race is its reference to Plaintiff being yelled at in front of someone who is white. But as discussed in a footnote above, merely being yelled at is not an adverse employment action for purposes of a general discrimination claim. Alternatively, the mere fact that such yelling happened to have been done in front of a white person— although consistent with racial animus—does not plausibly suggest racial animus, because it does not plausibly suggest that the yelling had anything at all to do with the race of the person being yelled at.

In short, Plaintiff has not plausibly alleged that anything that happened to her (including, most importantly, anything that potentially could properly be considered an adverse employment action for purposes of a Title VII claim of general discrimination) was based on racial animus. Accordingly, her claim of general discrimination must be dismissed.

Finally, the Court finds alternatively, as discussed below in connection with Plaintiff's retaliation claim, that Plaintiff in any event has abandoned any claim based on discrete adverse employment actions, and instead has placed all of her eggs in the hostile-work-environment basket. For this reason also, claims of general discrimination in violation of Title VII must be dismissed.

---

[16] The Court so states despite its realization that replacement in a job position by someone outside the Plaintiff's protected class does happen to satisfy one element of an indirect-evidence prima facie case of general discrimination.
.

C. The First Amended Complaint fails to set forth factual matter plausibly suggesting a retaliatory hostile work environment.

Plaintiff also alleges retaliation claims under Title VII, alleging that she suffered retaliation for complaining about the alleged racial discrimination. Defendant makes three arguments specific to Plaintiff's claim of retaliation. The first is that Plaintiff did not adequately allege a discrete "adverse employment action" taken with a retaliatory motive. The second is that Plaintiff did not adequately allege retaliatory harassment that was severe or pervasive as required. And the third is that Plaintiff has not set forth factual matter plausibly suggesting the required causal connection between Plaintiff's protected conduct (complaining about alleged racial discrimination) and the alleged adverse employment actions.

Title VII's anti-retaliation provision prohibits an employer from discriminating against any employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). The Sixth Circuit has found that "a retaliatory hostile work environment claim [is] a variety of retaliation." *Khamati v. Sec'y of Dep't of the Treasury*, 557 F. App'x 434, 443 (6th Cir. 2014). *See also Noviello v. City of Bos.*, 398 F.3d 76, 90 (1st Cir. 2005) (that to "' discriminate' in the anti-retaliation clause includes subjecting a person to a hostile work environment"). The upshot is that subjecting a plaintiff to a retaliatory work environment—a hostile work environment to which Plaintiff was subjected for complaining about alleged racial discrimination—is to subject the plaintiff to an adverse employment action. *See, e.g., id.* at 89 ("The weight of authority supports the view that, under Title VII, the creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action under 42 U.S.C. § 2000e–3(a). . . . We hold explicitly that a hostile work environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action for purposes of 42 U.S.C. § 2000e–3(a). This means that workplace

harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action.").

This in turn necessarily means that if a plaintiff has adequately alleged a retaliatory hostile work environment, the plaintiff need not otherwise adequately allege an adverse employment action as would be necessary to support of claim of general retaliation. Plaintiff clearly is pursuing a claim of retaliatory hostile work environment, and the Court will address that claim first.

Claims of retaliation, like claims of general discrimination, can defeat summary judgment via direct evidence of retaliation or via an indirect-evidence prima facie case of retaliation. But, again, an indirect-evidence prima facie case of retaliation need not be alleged in the complaint; it is enough that the complaint alleges factual matter that plausibly alleges that the defendant suffered an adverse employment action (which, as noted, could be a retaliatory hostile work environment) as a result of complaining about alleged general discrimination in violation of Title VII.

As discussed below, the Supreme Court has made clear that the standard for "adverse employment action" is relatively low in the context of retaliation claims. That is, acts will meet the standard provided only that were sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination. One might think that, since there is a more lenient (for plaintiffs) standard of "adverse employment action" in the context of retaliation than in the context of general discrimination, and because a retaliatory hostile work environment is an adverse employment action for purposes of a retaliation claim, that there would be in all respects a more lenient standard for establishing a retaliatory hostile work environment than for establishing a protected class-based hostile work environment. One would be mistaken, however, at least to an

extent. As with a protected-class based hostile work environment, in the Sixth Circuit[17] a retaliatory hostile work environment requires that the harassment be "severe and pervasive." *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 707 (6th Cir. 2012) ("To prevail on a Title VII claim of retaliatory hostile work environment a plaintiff must show [inter alia that she] suffered "severe or pervasive retaliatory harassment by a supervisor. . . .") (citing *Morris v. Oldham Cnty. Fiscal Ct.* 201 F.3d 784, 792 (6th Cir. 2000)).[18] In particular, it must be "severe or pervasive enough to *create an environment that a reasonable person would find hostile or abusive.*" *Mulvey v. Hugler*, No. 17-5633, 2018 WL 2771346, at *5 (6th Cir. Apr. 3, 2018) (emphasis added) (citation omitted).

In another sense, however, one would be correct because the required severity and pervasiveness need not sufficient *to alter the terms and conditions of the Plaintiff's employment,* as long as it is sufficient *to dissuade a reasonable worker from making or supporting a charge of discrimination.*[19] Contrary to Defendant's suggestion, (Doc. No. 56-1 at 160), based on the

---

[17] The Eleventh Circuit sees things quite differently. It has explicitly rejected the notion that a retaliatory hostile work environment must be severe or pervasive. *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 836 (11th Cir. 2021).

[18] *Cleveland* and *Morris* each made these observations in assessing whether the plaintiff could establish an indirect-evidence prima facie case, in reviewing the defendant's summary-judgment motion. But the Court has no doubt that these observations are equally applicable to a court assessing whether a plaintiff has made allegations plausibly suggesting a retaliatory hostile work environment, in reviewing a defendant's Rule 12(b)(6) motion to dismiss.

[19] There is arguably some tension between saying that the harassment must be "severe and pervasive" and saying that it need only be sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination. The Eleventh Circuit has resolved this arguable tension by saying that the harassment actually need not be severe and persuasive to support a claim of retaliatory hostile work environment. *Tonkyro*, 995 F.3d at 836. The Sixth Circuit has not necessarily resolved this arguable tension, but it is clear about what it requires for a claim of hostile work environment. It requires, separate and apart from a showing of material adversity, that the collective conduct that allegedly constitutes the retaliatory harassment be "severe" or "pervasive"; in other words, it requires first that the retaliatory harassment be severe and pervasive, and second that the retaliatory harassment be *sufficiently* severe or pervasive to *create an environment that a reasonable person would find hostile or abusive. See Mulvey v. Hugler*, No. 17-5633,

definition of "adverse employment action" in the context of retaliation claims, it is apparent that the question is not whether the harassment was sufficiently severe or pervasive to alter the plaintiff's conditions of employment, but rather whether the harassment was sufficiently severe to dissuade a reasonable worker from making or supporting a charge of discrimination.'" The Court so concludes based on the persuasive reasoning of the Fourth Circuit in *Laurent-Workman v. Wormuth*, 54 F.4th 201, 217 (4th Cir. 2022). There the court explained:

> A retaliatory hostile work environment must be so severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination. This standard retains the "middle path" set out in *Harris* between accepting "any conduct that is merely offensive" and requiring plaintiffs to show a "tangible" injury, 510 U.S. at 21–22, 114 S. Ct. 367. But it also harmonizes that compromise with the goal of the anti-retaliation provision "to provide broad protection from retaliation."

*Id.* at 217. The Fourth Circuit continued:

> [G]iven the Supreme Court and our precedents, a hostile work environment claim based on retaliation must instead allege that the retaliatory conduct (1) was unwelcome, (2) was sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination, and (3) can be attributed to the employer.

*Id.* at 218. Satisfying this standard (sometimes called the "material adversity" standard) is no minor feat. "[As] the Third Circuit has made clear[,] the 'material adversity' standard continues to 'separate significant from trivial harms' and 'unquestionably leaves in place a plaintiff's burden to show the allegedly hostile work environment was motivated by retaliatory animus.'" *Smith v. RB*

_____

2018 WL 2771346, at *5 (6th Cir. Apr. 3, 2018). Presumably, whenever the requirement of severity or pervasiveness is met, it necessarily would follow that the requirement of material adversity would be satisfied.
    The Court pauses to emphasize that it appears that the harassment must be severe or pervasive enough to do each of two different things: (i) make a reasonable person find the environment hostile or abusive; and (ii) dissuade a reasonable person from making or supporting a charge of discrimination.

*Distribution, Inc.*, 498 F. Supp. 3d 645, 664 (E.D. Pa. 2020) ( quoting *Komis v. Sec'y of the Dept. of Labor*, 918 F.3d 289, 299 (3d Cir. 2019)). And yet it is lower than the corresponding standard for claims of general retaliation.

As noted above, in the second of its three above-identified arguments as to retaliation, Defendant argues that Plaintiff did not adequately allege retaliatory harassment that was severe or pervasive as required. Defendant here does not gear its arguments to the correct, lower, standard for a claim of retaliatory hostile work environment, but rather to the higher standard applicable to a protected class-based hostile work environment. That is, Defendant does not attempt to explain why Plaintiff has not plausibly alleged that she was subjected to acts that (despite perhaps not *separately* amounting to adverse employment actions) collectively were sufficiently severe or pervasive satisfy the material adversity standard—*i.e.*, sufficient *to deter a reasonable person from making or supporting a charge of racial discrimination*. Instead, Defendant claims that the harassment must be "'*sufficiently severe or pervasive to alter the conditions of the victim's employment* and create an abusive working environment.'" (Doc. No. 56-1 at 16) (quoting *Broska v. Henderson*, 70 F. App'x 262, 269 (6th Cir. 2003)).

But encompassed within Defendant's argument is the assertion that the alleged harassment was not "severe or pervasive," period. This assertion is relevant because, as noted, in a footnote, the Sixth Circuit requires an initial determination of severity or pervasiveness before turning to whether the severe or pervasive harassment satisfies the applicable standard (material adversity) for retaliation claims. Defendant does not develop this argument as well as it should have. For example, Defendant does not really address the below-applicable factors for determining severity and pervasiveness. Additionally, Defendant claims that the Complaint "includes [only] one allegation of harassment, [*i.e.*] that Plaintiff was subjected to harassment: 'On October 9, 2019,

Brown yelled at plaintiff in front of a white faculty member.'" (Doc. No. 56-1 at 17). This sells the First Amended Complaint somewhat short, because as indicated above harassment to support a claim of hostile work environment can be in the form of intimidation, ridicule, and insult. And this applies to a claim of retaliatory hostile work environment in particular. *See, e.g., Tonkyro*, 995 F.3d at 835; *Roe v. Gates*, No. 3:03CV192, 2009 WL 3063393, at *8 (S.D. Ohio Sept. 21, 2009). Construing the complaint in Plaintiff's favor, she alleges three such incidents, as discussed above. But as set forth below, Defendant's argument ultimately prevails because, as Defendant asserts, Plaintiff has not plausibly alleged factual matter suggesting severe or pervasive harassment.

As noted above, in assessing severity or pervasiveness, the court considers the totality of the circumstances, and in so doing, it considers "a number of factors, including 'the frequency of the discriminatory [meaning, here, retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[20] *Cleveland*, 491 F. App'x at 707 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. at 23). *Cleveland* was decided in the context of an alleged retaliatory hostile work environment, and so it makes clear that the standard for severity or pervasiveness is the same in this context as in the context of alleged protected class-based hostile work environment. And as explained above, the standard is simply not met by the allegations of the First Amended Complaint, because the three instances eligible for consideration here do not

---

[20] The Court notes, with respect to the bracketed language it added to the quote here, that "Title VII defines retaliation as a form of discrimination." *Nealy v. Shelly & Sands, Inc*., 852 F. App'x 879, 883 (6th Cir. 2021).

plausibly suggest severity or pervasiveness.[21] Accordingly, Plaintiff has not set forth factual matter

plausibly suggesting a retaliatory hostile work environment, and so this claim must be dismissed.

D. <u>Plaintiff has abandoned a claim of general discrimination retaliation.</u>

The first of Defendant's three above-referenced arguments is geared towards a claim of

general retaliation. That is, Defendant argues in essence that Plaintiff has not alleged a discrete

adverse employment action to support a claim of retaliation.

As to this, Defendant gets off to a good start, noting the correct standard for ascertaining

the existence of an adverse employment action in the context of a claim of retaliation. (Doc. No.

56-1 at 15) (noting that "[a] plaintiff establishes a materially adverse action when she offers proof

that the challenged action "might well have dissuaded a reasonable worker from making or

supporting a charge of discrimination.") (citing *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir.

2013)). But then Defendant goes significantly off track, thereafter treating the standard in the

retaliation context as if it was the more stringent standard applicable in the context of general

claims of discrimination. It cites multiple cases that, as it turns out, were decided in the context of

a general discrimination claim, rather than retaliation claim. (*Id.* at 15-16). It does cite one case

decided in the context of a retaliation claim, *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d

789, 795 (6th Cir. 2004), *aff'd sub nom. Burlington Northern and Santa Fe R. Co. v.* White, 548

U.S. 53 (2006); it cites that portion of *White* for the proposition that "employment actions that are

*de minimus* are not actionable under Title VII." (*Id.* at 15). But this proposition is unexceptional,

---

[21] Defendant additionally relies on the notion that Plaintiff has not adequately alleged that the alleged hostile work environment was based on race. This notion is correct, as discussed above, but it is immaterial here; Plaintiff does not need to allege that a *retaliatory* hostile work environment was based on race; Plaintiff instead needs to plausibly allege that the hostile work environment was (in addition to being sufficiently severe and pervasive to dissuade her from making a complaint of alleged racial discrimination) animated by a *retaliatory motive*. Whether Plaintiff has succeeded in so doing is an issue the Court need not reach, because she has not adequately alleged a hostile work environment of *any* kind, retaliatory or otherwise.

and *White* cannot be relied upon for anything more helpful on this point, because as to the standard for "adverse employment actions" in the context of retaliation claims, *White* actually was overruled by the Supreme Court in *Burlington Northern*. Despite affirming the decision in *White*, the Supreme Court disagreed with *White's* view that the standard was the same in the context of retaliation claims as in the context of general discrimination claims. Specifically, the Sixth Circuit "reject[ed] White's and the EEOC's request that we adopt a new definition of adverse employment action for purposes of Title VII retaliation cases, and we reaffirm the definition that we have developed in cases such as *Kocsis* and its progeny," 364 F.3d at 800, meaning a "materially adverse change in the terms and conditions of [plaintiff's] employment." *Id.* at 795 (internal quotation marks omitted). The Supreme Court disagreed, and opted instead for the approach of certain other circuits.

> As we have explained, Courts of Appeals have used differing language to describe the level of seriousness to which this harm must rise before it becomes actionable retaliation. We agree with the formulation set forth by the Seventh and the District of Columbia Circuits. In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

*Id.* at 67-68. *See also* *Phelan v. Cook Cnty.,* 463 F.3d 773, 781, n. 3 (7th Cir. 2006) (stating that in *Burlington Northern,* the Supreme Court held that "the Title VII retaliation provision protects an employee from a wider range of conduct than the discrimination provision does"), *overruled on other grounds*, *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (11th Cir. 2016).

This means that the question of whether something constitutes an adverse employment action for purposes of a retaliation claim is different from the question of whether it constitutes an adverse employment action for purposes of a general discrimination claim, and the two questions must be analyzed separately. *Allen v. Ohio Dep't of Job & Fam. Servs.*, 697 F. Supp. 2d 854, 895

(S.D. Ohio 2010). In making its first argument, Defendant (which, as noted above, has the burden of explanation as the movant herein) does not properly frame or address the former question, which is the question here.

Ultimately, however, that does not cost Defendant, because Plaintiff has abandoned any claim of general retaliation, *i.e.*, retaliation based on discrete adverse employment actions. Instead, Plaintiff is proceeding based only on a claim of retaliatory hostile work environment.

In summary, Plaintiff has failed to state a claim for retaliatory hostile work environment, and that is her only remaining claim of retaliation. Accordingly, Plaintiff's claim of retaliation must be dismissed for failure to state a claim upon which relief may be granted.[22]

## CONCLUSION

In response to Defendant's assertion that Plaintiff's claims were subject to dismissal for failure to timely exhaust administrative remedies, Plaintiff made clear that she was proceeding based only on a theory of hostile work environment. But she has failed to plausibly allege a hostile work environment with respect either to her claim of race discrimination or her claim of retaliation. Accordingly, the First Amended Complaint must be dismissed in its entirety, with prejudice.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[22] Thus, the Court need not address Defendant's third argument with respect to retaliation.